IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DEBRA MARIE HANSEN<br><br>Plaintiff,<br><br>vs.<br><br>NOVARTIS PHARMACEUTICALS CORPORATION, a Delaware Corporation, NOVARTIS AG, NOVARTIS PHARMA AG, and NOVARTIS INTERNATIONAL PHARMACEUTICAL, LTD., JOHNSON AND JOHNSON, a Pennsylvania corporation, and JOHN DOES 1 THROUGH 50,<br><br>Defendants. | **OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br><br><br>Case No. 2:08-cv-985<br><br>Judge Dee Benson |

Before the Court is Defendant Novartis Pharmaceutical Corporation's ("Defendant") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a). At issue is when Plaintiff Debra Marie Hansen ("Plaintiff") discovered, or in the exercise of due diligence should have discovered, her injury and a possible causal relation of Defendant's product to her injury for purposes of complying with Utah's two-year statute of limitations. Defendant alleges that Plaintiff's Complaint is time-barred under the Utah Products Liability Act ("UPLA")

1

because Plaintiff knew about her injury and its cause by at least September 2005 – and no later than July 2006, more than two years before Plaintiff filed her Complaint. Plaintiff opposes the motion, holding that the statute of limitations had not expired when she filed her Complaint because Plaintiff did not discover the cause of her injury until March 2007.

## I. FINDINGS OF FACT

**1. Duragesic®**

Duragesic® is a prescription transdermal patch manufactured by Defendant that delivers pain-relieving medication through the skin. It is intended for patients who need long-term, continuous relief from chronic pain. Plaintiff began using Duragesic® in September 2000 to treat chronic pain and nerve damage she suffered in a workplace accident in April 1999. In February 2001, Plaintiff developed pneumonia. Later that year, Plaintiff started having self-described "fugue states": episodes of blacking-out and amnesia lasting from twenty to ninety minutes, which caused personality changes that consisted of screaming, memory loss, and withdrawal from her environment. (Def.'s Mem. Supp. Mot. Summ. J. 3 (Dkt. No. 32)).

**2. History**

In July 2005, Plaintiff experienced a fugue state during which she tried to jump out of a thirty-third floor hotel window. Plaintiff thereafter kept a journal chronicling her fugue states and her use of Duragesic®. (*Id.*) Plaintiff's physicians continued to prescribe the patch, but Plaintiff and her husband were "pretty sure" the patches were causing the fugue states. (Pl.'s Mem. Opp. Def.'s Mem. Supp. Mot. Summ. J. 2-3 (Dkt. No. 35)).

In September 2005, Plaintiff reported to her primary care physician, Dr. James Rose, that

"she thought she knew" that the fugue states were caused by her Duragesic® patches because "they had a defective membrane and were giving her excess release of medication." (Def.'s Mem. Supp. Mot. Summ. J. 4 (Dkt. No. 32)). . Dr. Rose agreed this was a possible response to Duragesic®; however, neither Dr. Rose nor Dr. Richard Rosenthal, Plaintiff's pain management physician, changed her medication. (Pl.'s Mem. Opp. Def.'s Mem. Supp. Mot. Summ. J. 3 (Dkt. No. 35)). In January 2006, Plaintiff continued writing in her journal to rule out the several other medications she was taking as potential causes of her fugue states. (*Id.* at 4). Plaintiff also began retaining the packaging of Duragesic® patches that she believed had "failed." (*Id.*)

On January 20, 2006, police officers found Plaintiff wandering and disoriented. When the officers returned Plaintiff to her home, Plaintiff did not recognize her husband or her house. Plaintiff's husband informed the officers this was because of her "medication patch." (Pl.'s Mem. Opp. Def.'s Mem. Supp. Mot. Summ. J. 5 (Dkt. No. 35)). Plaintiff attributed the episode to Duragesic® in a journal entry dated that day. (*Id.*)

On January 24, 2006, Plaintiff told Dr. Rose that she felt "most of her episodes begin on the first day of a new patch," and that she had learned pneumonia was a potential side-effect of Duragesic®. (Def.'s Mem. Supp. Mot. Summ. J. 5 (Dkt. No. 32)). On the next day, Plaintiff told her pulmonologist, Dr. Michael Pearce, that her episodes of dizziness and lightheadedness were possibly related to Duragesic®. (*Id.*) Neither Dr. Rose nor Dr. Pearce validated her statement. By February 2006, Plaintiff had "pretty much" ruled out other medications as the cause. (*Id.*)

On July 18, 2006, Plaintiff was removed from Dr. Rosenthal's office and taken by ambulance to the hospital after Plaintiff was lethargic and unable to sit in a chair without

support. Plaintiff's Duragesic® patch was removed before boarding the ambulance. Following her release three days later, Dr. Rosenthal immediately discontinued Plaintiff's use of Duragesic®. On July 31, 2006, Plaintiff informed Dr. D. Brian Olenslager that she was no longer taking Duragesic® and that she had previously experienced altered mental states that she felt were from Duragesic®. (Def.'s Mem. Supp. Mot. Summ. J. 6 (Dkt. No. 32)).

Plaintiff saw Dr. Rose on August 8, 2006 and informed him about her recent hospitalization for a "narcotic overdose felt to be caused by abnormal absorption of her Duragesic® patches." (Def.'s Mem. Supp. Mot. Summ. J. 6 (Dkt. No. 32)). Plaintiff also stated that "the onset of her episodes of sedation and confusion were triggered by the application of a new Duragesic® patch." (*Id.*). In November 2006, Jeff Pierson, PA-C, noted that Plaintiff had severe hair loss and that her hair was so brittle it would fall out when she showered. (Pl.'s Mem. Opp. Def.'s Mem. Supp. Mot. Summ. J. 10 (Dkt. No. 35)). This was attributed to the remnants of Duragesic® leaving her body. (*Id.*) By January 2007, Plaintiff's medication use remained the same except for the Duragesic® patch. Notably, by that point, the intermittent fugue states had finally stopped. Plaintiff filed her Complaint against Defendant on October 10, 2008.

## II. STANDARD OF REVIEW

**1. Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could

4

return a verdict for the nonmoving party." *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). A court considering summary judgment should consider the evidence in the light most favorable to the non-moving party. *See, e.g. Gwinn v. Awmiller*, 354 F.3d 1211, 125 (10th Cir. 2004). A defendant may use a motion for summary judgment to test an affirmative defense that entitles that party to a judgment as a matter of law, including the affirmative defense of statute of limitations. *Cannon v. Minnesota Mining and Manufacturing Co.*, 2009 WL 350561 (D. Utah Feb. 11, 2009).

**2. Utah Product Liability Act**

UPLA states: "A civil action under this part shall be brought within two years from the time the individual who would be the claimant in the action discovered, or in the exercise of due diligence should have discovered, both the harm and its cause." Utah Code Ann. § 78B-6-706 (2008). The UPLA's statute of limitations applies to all claims, including Plaintiff's claim at in this case, against a manufacturer based on a defective product in both tort and contract, including claims based on negligence, strict liability, tortious misrepresentation, and breach of warranty. *See Utah Local Government Trust v. Wheeler Machinery Co.*, 199 P.3d 949, 951 (Utah 2008).

"As a general rule, a statute of limitations begins to run 'upon the happening of the last event necessary to complete the cause of action.'" *Russell Packard Development, Inc. v. Carson*, 108 P.3d 741, 746 (Utah 2005) (citing *Myers v. McDonald*, 635 P.2d 84, 86 (Utah 1981)). "Once a statute has begun to run, a plaintiff must file . . . her claim before the limitations period expires or the claim will be barred." *Russell Packard Development*, 108 P.3d at 746.

Given the requirements above, the UPLA statute of limitations begins to run when the

plaintiff discovers, or should have discovered: (1) that she has been injured; (2) the identity of the maker of the allegedly defective product; and (3) that the product had a possible causal relation to her injury. *See Aragon v. Clover Club Foods Co.*, 857 P.2d 250, 252-53 (Utah Ct. App. 1993). Notably, the knowledge required of a plaintiff is inquiry notice: a plaintiff need not have a "confirmed diagnosis" about the causal relation to trigger the running of the statute of limitation. *See McKinnon v. Tambrands, Inc.*, 815, F.Supp 415, 420 (D. Utah 1993). "[A]ll that is required to trigger the statute of limitations is sufficient information to put plaintiff [ ] on notice to make further inquiry if [she] harbors doubts or questions." *Griffiths-Rast v. Sulzer Spine Tech*, 216 Fed. Appx. 790, 792 (10th Cir. 2007) (citing *Macris v. Sculptured Software, Inc.*, 24 P.3d 984, 990 (Utah 2001)).

Plaintiff correctly noted the majority rule that when a plaintiff knew or reasonably should have known about the cause of action is a question for the jury. *See McKinnon*, 815 F.Supp. at 418 (citing *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). However, "[w]here the evidence is so clear that there is no genuine factual issue . . . the determination can be made as a matter of law." *McKinnon*, 815 F.Supp. at 418. Based on the analysis below, the record conclusively demonstrates that there is no genuine factual issue that Plaintiff knew, or should have known, about her injury and its causal relationship with Duragesic® more than two years before filing her Complaint. Thus, Plaintiff's Complaint is barred under the UPLA.

### III. ANALYSIS

**1. Plaintiff's Injury**

The first inquiry the court must make is when Plaintiff discovered, or should have

6

discovered, that she suffered an injury as contemplated by UPLA. *See Cannon*, 2009 WL 350561 at 5. This Court has previously held that to establish that a plaintiff suffered an injury sufficient to begin the statute of limitations period, the defendant must show proof that the plaintiff suffered actual damages. *See id.*

Based on the evidence in the record, it is clear a reasonable jury could only find that Plaintiff discovered that she had suffered actual damages no later than July 2006. Plaintiff first began suffering from pneumonia and fugue states in 2001. The record is clear that between 2001 and 2006, Plaintiff suffered numerous fugue states that included Plaintiff trying to throw herself out of a window in July 2005, Plaintiff wandering disoriented and unable to recognize her home or husband in January 2006, and Plaintiff requiring an emergency ambulance trip to the hospital in July 2005. Moreover, the record is clear that Plaintiff wrote about her injuries in her journal and discussed them at various times with her physicians, evincing that Plaintiff recognized her injuries.

Given this evidence, it is clear as a matter of law that Plaintiff suffered actual damages – and that Plaintiff discovered these actual damages – as early as 2001, but not later than July 2006, more than two years before Plaintiff filed her Complaint for purposes of beginning the statute of limitations under UPLA.

**2. Identity of the Maker of the Product**

There is no dispute between the parties that Defendant is the manufacturer of Duragesic®. Consequently, the second element is satisfied in Defendant's favor. Thus, the issue in the case turns on the third element, discussed below.

7

### 3. Product's Possible Causal Relation to Injury

The third, and in this case, crucial, element is to determine when Plaintiff discovered, or should have discovered, a possible causal relation between the product and her injury. Defendant maintains that Plaintiff was aware of the possible causal relation between her injury and Duragesic® by at least September 2005, when she informed Dr. Rose that she believed the fugue states were a result of a "defective membrane" in the Duragesic® patches. (Def.'s Mem. Supp. Mot. Summ. J. 10 (Dkt. No. 32)). Plaintiff, conversely, asserts Plaintiff could not have conclusively discovered that Duragesic® was the cause of her injuries until March 27, 2007, when her physicians were able to monitor her progress after the patches had been completely removed from her regimen. (Pl.'s Mem. Opp. Def.'s Mem. Supp. Mot. Summ. J. 18 (Dkt. No. 35)).

The Court, while sympathetic to Plaintiff's unfortunate medical condition, finds that a reasonable jury could only find that Plaintiff discovered a possible causal relationship between her injuries and Duragesic® at a point no later than August 2006, more than two years before Plaintiff filed her Complaint. The record clearly indicates that Plaintiff knew, or should have known, that the harm was caused by Duragesic® as early as July 2005 when Plaintiff began keeping a journal of her fugue states and her use of Duragesic®. Moreover, that same year, Plaintiff and her husband indicated that they were "pretty sure" that the patches were causing the fugue states. (Pl.'s Mem. Opp. Def.'s Mem. Supp. Mot. Summ. J. 2-3 (Dkt. No. 35)). The record is also clear that between July 2005 and August 2006, Plaintiff noted numerous times in her journal and also discussed with Dr. Rose, Dr. Rosenthal, and Dr. Olenslager that there was a

8

correlation between her fugue states and Duragesic®.

Plaintiff maintains that this evidence is not enough to begin the statute of limitations because Plaintiff could not have definitively known that Duragesic® was the cause of her injuries until March 2007 when her physicians could conclusively determine Duragesic® was responsible for the fugue states and pneumonia once the patches had been removed. However, both the *Cannon* and the *McKinnon* cases, cited heavily by Plaintiff and Defendant, hold that a definitive confirmation of the cause of a plaintiff's injury is not required to be on reasonable notice. Rather, as noted above, mere inquiry notice upon an injury to a plaintiff is necessary to begin the statute of limitations..

The record clearly indicates that Plaintiff at least recognized some relation between her fugue states and Duragesic® – at the latest – in August 2006. Plaintiff therefore not only had information sufficient to put her on notice to make further inquiry, the record also indicates that Plaintiff did make further inquiry by recording fugue states in her journal, keeping Duragesic® packages that had failed, and discussing her fugue states with her physicians. Plaintiff clearly satisfied the inquiry notice requirement. As in *Cannon*, it is not material that Plaintiff did not receive an unequivocal opinion that Duragesic® had harmed Plaintiff until March 2007, as such an opinion is not needed to begin the running of the statute of limitations.

Based on the analysis above, the record is clear as a matter of law that Plaintiff knew or should have known about the causal relation between her injury and Duragesic® more than two years prior to filing suit. Defendant, therefore, has satisfied all three elements under a UPLA statute of limitations analysis and Plaintiff's Complaint is time-barred.

## IV. CONCLUSION

The only reasonable conclusion based on the evidence viewed in the light most favorable to Plaintiff is that Plaintiff discovered, or should have discovered, both her injury and its causal connection to Duragesic® more than two years before Plaintiff filed her Complaint. Because under UPLA a plaintiff must bring an action within two years from the discovery of the harm and its cause, Plaintiff's claim is time-barred. Defendant's Motion to Dismiss is therefore GRANTED.

IT IS SO ORDERED.

DATED this 7th day of December, 2011.

Dee Benson
United States District Judge